IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KUMKE V. PALU

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JERRY KUMKE, APPELLEE,

V.

CLINT J. PALU, APPELLANT.

Filed December 26, 2024.    No. A-23-1035.

Appeal from the District Court for Lancaster County: MATTHEW O. MELLOR, Judge.
Affirmed.

Patrick T. Vint, of Woods Aitken, L.L.P., for appellant.

J. Michael Hannon and Eric S. Sutton, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., for
appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Jerry Kumke and Clint J. Palu entered into a "rent-to-own or land contract" for a property
in Lincoln, Nebraska. Under the terms of the agreement, Kumke was to make monthly payments,
with a final balloon payment due on September 1, 2011. Kumke made the required monthly
payments but when he knew he could not make the final balloon payment as scheduled, he talked
with Palu. Kumke claimed that Palu told him to continue making the monthly payments, which
would continue to apply towards the purchase price of the property. Palu disputed this, claiming
that the parties entered into a standard rental agreement after Kumke failed to make the balloon
payment. When Kumke attempted to make a final payment in 2020, Palu refused to accept the
balance remaining under the parties' agreement and instead demanded the fair market value of the
home. Kumke filed an action in the Lancaster County District Court. The district court quieted title

- 1 -

in Kumke and ordered him to pay a judgment of $82,849.96 to Palu, less court costs. Palu appeals. We affirm.

BACKGROUND

Palu and his former wife purchased a home on Rosebriar Court in Lincoln in 1996. Palu and Kumke worked near each other, they became friends, and at one point were roommates for a while. In July 2005, Palu and Kumke entered into an oral lease agreement for Kumke to rent the Rosebriar property for $750 a month. Approximately 1 year later, the parties began negotiating a "rent-to-own or land contract deal where [Kumke] would . . . [c]ontinue living there and buy that house." On August 1, 2006, they entered into a purchase agreement consisting of an "Offer to Purchase" signed by Kumke and an "Acceptance of Offer" signed by Palu. Pursuant to the purchase agreement, Kumke was to pay a total of $135,000, plus 4.75 percent interest per annum, for the property. This was to be done through monthly payments of $550, starting on September 1, 2006, with a final balloon payment due on September 1, 2011. The "Offer to Purchase" specified that the $550 payments "include[d] interest."

The parties also entered into a deed of trust on September 1, 2006, naming Kumke as the trustor, Palu's uncle as the trustee, and Palu as the beneficiary. The deed of trust attempted to transfer ownership of the property from Kumke to Palu despite Kumke not holding title to it. Failure to make any payment when due was an event of default under the deed of trust. Additionally, the deed of trust required Kumke to pay the property's real estate taxes and to maintain fire and extended coverage insurance on it. The parties also executed an installment promissory note the same day, which outlined Kumke's payment schedule. All documents related to the parties' transaction were drafted by Palu's uncle, a certified public accountant.

Kumke began making monthly payments of $750 on September 1, 2006. He stated that he paid $200 more than the agreed-upon $550 because "that's how much [he] was paying for rent," and he wanted to pay off the balance of the property sooner. Prior to the balloon payment deadline of September 1, 2011, Kumke approached Palu with concerns about his ability to make the payment. According to Kumke, Palu told him to "[j]ust keep making the payments" and that the payments would continue to apply to the purchase price of the property. The following colloquy occurred at trial between Kumke's counsel and Kumke:

[Counsel]: And as that payment came near, did you express your concern to Mr. Palu?

[Kumke]: Yes, I did. Reexpressed those.

[Counsel]: You had a conversation with him?

[Kumke]: Yes.

[Counsel]: What was the substance of that conversation?

[Kumke]: That I didn't know if I could do it, and I was concerned about it. And his response was, that's okay, don't worry about it. Just keep making the payments and we'll just keep going.

. . . .

[Counsel]: So, when you were making $750 payments after September 1st, 2011, Mr. Palu represented to you that those would be . . . applied to the purchase of the house?

[Kumke]: That's correct.

- 2 -

This conversation was not memorialized in writing, and Palu claimed that the parties transitioned into a standard rental agreement after Kumke was unable to make the balloon payment. Nonetheless, the parties agreed that Kumke continued to make monthly payments of $750 after September 1.

Sometime between January and May 2020, Kumke approached Palu about making the final payment on the property to obtain ownership. Palu told Kumke that he could purchase the property at its fair market value, which was approximately $228,800, rather than the balance remaining under the purchase agreement. Kumke testified that this was the first time Palu indicated he would need to pay fair market value for the property. He also learned that, at some point, Palu had taken the position that Kumke had merely been renting the property since September 2011. Palu returned Kumke's monthly check in October 2020 and stopped cashing all checks sent thereafter. (Kumke eventually stopped sending checks in June 2021.) On November 7, 2020, Palu sent Kumke a letter notifying him of the termination of his tenancy. Kumke refused to vacate the property and initiated this action on December 10, 2021.

Kumke asserted several causes of action, including breach of contract, unjust enrichment, fraudulent inducement, and fraudulent misrepresentation. He sought relief through specific performance and a quiet title determination. Palu filed an answer and counterclaim, asserting causes of action for breach of contract and trespass, and requesting that the district court quiet title in his favor.

Trial took place on June 28, 2023. Both parties testified, and numerous exhibits were received into evidence. Palu's former wife testified on behalf of Kumke. In addition to the facts set forth above, the following evidence was adduced at trial.

Kumke testified that he believed he was ultimately purchasing the property, so he made significant repairs and improvements to it both before and after September 1, 2011. These repairs and improvements included, but were not limited to, installing kitchen lighting, repairing the kitchen floor, refinishing the kitchen cabinets, replacing the refrigerator and dishwasher, installing wood flooring in the basement, adding a utility sink in the laundry room, rerouting the sump pump hose, installing a walkout door to the garage, drywalling the garage, replacing multiple windows, and building two decks. He kept records of each project, contained in exhibit 11. According to the exhibit, he spent a total of $70,110.65 on materials and labor over the years. Palu presented a different version of these facts. He testified that Kumke was required to maintain the property pursuant to their agreement and that he financed "most" of Kumke's projects. He stated that the "going [rental] rate" for the property was $1,500 but he agreed to charge Kumke half that amount, on the condition that Kumke would maintain the property.

Palu's former wife filed for divorce in 2016 in Hall County, Nebraska. Her divorce from Palu was finalized in 2019, and exhibits from their proceedings were received into evidence at trial in this case. In Palu's 2017 property statement, he represented that the Rosebriar property had been "Sold 2006 Land Contract" and that the value was "unknown." On the other hand, his former wife assigned a value of $18,000 to the property. She testified that, although she had been unaware of Palu's purchase agreement with Kumke, she believed this was the amount Kumke owed on the property at the time based on discovery. She relied on a document Palu filed with the district court in Hall County which recorded Kumke's payments over the years, beginning in September 2006.

Following February 2018, the entries were in Palu's handwriting. The final entry, dated November 2018, included a note stating, "Jerry [Kumke] owns." Based on this, Palu's former wife believed that Kumke "owned the house as of November 2018 with a zero [dollar] balance."

Palu was asked on cross-examination why his property statement represented that the Rosebriar property had been sold. The following colloquy occurred between Kumke's counsel and Palu regarding exhibit 16, which was Palu's property statement used in the course of his divorce:

[Counsel]: And this was provided as part of your divorce before it was finalized regarding all the assets that you and your wife owned?

[Palu]: Okay.

[Counsel]: Do you agree with that?

[Palu]: Okay. Yes. I agree to that.

[Counsel]: Okay. Let's skip down to category E, it lists real estate.

. . . .

[Counsel]: And, also, the Rosebriar Court property here is listed.

[Palu]: Correct.

. . . .

[Counsel]: It lists your present value, see K16, sold 2006, land contract. Do you see that?

[Palu]: I see it says that. It was never sold in 2006.

[Counsel]: And for wife's present value it says $18,000. Do you see that?

[Palu]: Yes.

. . . .

[Counsel]: And earlier you testified you don't know why it says sold 2006, land contract, in this document; is that what you testified to?

[Palu]: Right.

. . . .

[Counsel]: . . . Why does it say sold 2006, land contract?

[Palu]: I did not put that in there.

[Counsel]: You filed this, did you not?

[Palu]: My lawyer did.

[Counsel]: Your signature appears on it?

[Palu]: I did not sell the house.

[Counsel]: You represented to the Hall County court and your ex[-]wife --

[Palu]: Okay.

[Counsel]: -- that it was sold in 2006?

[Palu]: I don't know.

[Counsel]: And the best explanation you have today is I don't know?

[Palu]: Yeah. I did not sell it in 2006. If you want to bring up my tax returns, it will show that I never sold that property in 2006. I don't know why she put that in there.

[Counsel]: Who is she?

[Palu]: . . . [M]y divorce lawyer.

. . . .

[Counsel] And you signed Exhibit 16?

- 4 -

[Palu]: Am I an attorney?

[Counsel]: I said you signed Exhibit 16, did you not?

[Palu]: Yes, what she filed.

Palu further explained that his former wife refused to provide discovery regarding her retirement accounts, so they made a deal that "[he] would get the [subject property] if [he left] her retirement and pension and 401(k) alone."

The Palus' property settlement agreement, which was incorporated into their dissolution decree, was also received into evidence in this case. The Rosebriar property was not listed in the "real estate" section of the settlement agreement. Rather, under "deed of trust notes/land contract payments," the district court awarded Palu "all interest, if any, in the deed of trust note or land contract payments owed to the parties by Jerry Kumke as a result of the sale of [the subject property] as his sole and separate property, free and clear of any interest of [the former wife]."

Palu was questioned about his tax returns at trial. He was asked about his personal income reported in 2012 and admitted that the subject property was not listed on his Schedule E form. He stated that the "rent" he received from Kumke beginning in September 2011 was included in the gross income of his business, C.P.S.S. Incorporated ("CPSS"). He admitted that CPSS does not own the subject property; he personally does. However, it pays for the "upkeep" of the property and for the fuel to go check on it. Regarding the corporation's tax returns, Palu admitted that he did not report any amount under the "[n]et rental, real estate income (loss)" section on its Schedule K form. When asked about this discrepancy, he stated, "I didn't fill out the taxes. I'm not a CPA. I don't do my taxes." Palu stated that he has reported the property's rental income the same each year, "all through CPSS Inc., through my gross income."

As previously discussed, the deed of trust required Kumke to pay the property's real estate taxes and to maintain insurance on it. Kumke testified that he did not pay the property's real estate taxes, explaining that the tax bills were not sent to him and that Palu did not provide them to him. He also testified that he did not maintain insurance on the property because he did not hold title to it. Instead, he insured the contents of the house.

On November 7, 2023, the district court issued an order finding that the parties had entered into a valid purchase agreement. The court further concluded that Palu waived the balloon payment in 2011, and that the statute of frauds did not apply to the waiver. It did not find Palu's testimony to be credible, and therefore, could not "conclude that a new, oral contract was recreated for a rental of the [property]." Accordingly, it found that Palu breached the contract and (1) ordered Kumke to deposit the remaining amount owed on the property with the court within 45 days, (2) ordered Palu to file and deliver to Kumke a duly executed warranty deed for his interest in the property within 5 days of Kumke's deposit, and (3) ordered the parties to file an affidavit with the court attesting to the completion of the terms of its order. In determining that a waiver existed, the court pointed out that Palu represented the property as sold in his divorce. It also stated, "[T]he waiver of the balloon payment did not interrupt the land contract . . . and the terms of $550.00 per month at 4.75% interest were still in effect." The court held that Kumke's remaining claims were moot and denied Palu's claims.

On November 15, 2023, Kumke filed a motion to amend the judgment, indicating that the district court's November 7 order "did not specify the balance of the amount owed on the Property"

and requested a "sum certain that is to be deposited with the Clerk of the District Court to effectuate the transfer of the Property." Kumke represented that the amount owed was $82,849.96. Kumke also requested costs of $1,116.35.

On December 13, 2023, the district court filed an amended order specifying that Kumke owed Palu $82,849.96 for the remaining balance on the property. It appears that the court utilized the amortization schedule contained in exhibit 2 to determine the remaining balance. The court also assessed $891.76 in taxable costs against Palu, for which Kumke received credit. As such, Kumke was instructed to deposit $81,958.20 with the court within 45 days of the November 7 order. All other terms of the November 7 order remained in place.

Palu appeals.

## ASSIGNMENTS OF ERROR

Palu assigns that the district court erred in (1) finding that the parties entered into an enforceable "oral amendment" to the real estate contract and (2) its calculation of damages due to Palu from Kumke.

## STANDARD OF REVIEW

A quiet title action sounds in equity. *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

### WAIVER

Palu assigns that the district court "erred in finding that the parties entered into an enforceable oral amendment to the real estate contract" because the "alleged oral amendment" could not be waived unless in writing and was not enforceable under the exception to the statute of frauds for partial performance. Brief for appellant at 6.

Palu does not dispute the existence of the 2006 real estate contract. Rather, the parties "differ on whether the real estate contract was amended or waived by oral agreement when Kumke failed to make the required balloon payment in September 2011, or whether the parties orally agreed to revert to their prior lease." *Id*. at 9-10. He references language in the deed of trust instrument, where at paragraph 16 it states that "[t]his instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought." He therefore contends that the district court erred in determining that he waived his right to enforce the balloon payment in September 2011.

However, as argued by Kumke, there was no "oral amendment" to the purchase agreement nor "did the parties agree to a new contract." Brief for appellee at 16. "Instead, as the District Court properly concluded, Palu waived *one condition* of the land contract, the balloon payment, and

- 6 -

allowed Kumke to continue making monthly payments towards the agreed upon purchase price of the Property." *Id*. (Emphasis in original.) We agree.

The determination of whether a contractual provision has been waived is a factual determination. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019). Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. *Id.* In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part. *Id.* A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive. *Id.* Even a provision in a written contract that specifies that a waiver of the conditions and terms of the agreement must be in writing may be waived by acts or conduct. *Id.*

In this case, the district court observed that there was "conflicting testimony at trial concerning the nature of the conversation that occurred when [Kumke] approached [Palu] about the inability to make the balloon payment at the predetermined time." Notably, the court specifically found that Palu's testimony was not credible, and it could not conclude that a "new, oral contract was recreated for a rental of the home." Rather, the court looked to Palu's actions to determine there was a waiver of the balloon payment in 2011.

The record supports the district court's findings and conclusion that Palu waived his right to enforce the balloon payment. Palu represented the property as "sold" during his divorce proceedings in 2019 and he explicitly referred to the 2006 land contract with Kumke. This representation directly contradicts his later claim that the purchase agreement was no longer in effect after 2011. When confronted about this inconsistency, Palu did not offer a reasonable explanation. Instead, he blamed his divorce lawyer.

Palu also failed to report the purported rental income from Kumke on his tax returns. If the payments from Kumke were rent, he would have been required to report them as such. Instead, he claimed that the payments were included in his corporation's gross income. This assertion lacks credibility for several reasons. CPSS does not own the property; Palu personally does. Moreover, Palu did not report any amount under the "[n]et rental, real estate income (loss)" section of the corporation's Schedule K form. When pressed on this issue, he once again shifted blame, this time to his certified public accountant.

Additionally**,** Kumke's substantial improvements to the property after 2011 offer compelling evidence that he was operating under the belief that the purchase agreement was still valid. Records show that Kumke spent over $70,000 on repairs and improvements over the years, including constructing decks and renovating rooms. These expenditures go far beyond the ordinary maintenance expected of a tenant. Palu's claim that these improvements were merely required as part of a rental maintenance agreement is not plausible, particularly given the nature of the improvements.

Finally**,** Kumke's payment history strongly supports the district court's conclusion. After 2011, Kumke continued to make monthly payments of $750, which exceeded the $550 payment specified in the purchase agreement and included interest. Despite Palu's contention that the arrangement had reverted to a lease, he accepted these payments for years without objection or

clarification. He testified that he could have been charging Palu more for rent. However, if their arrangement had genuinely been a rental agreement, he would have had the option to raise Kumke's rent.

The foregoing facts undermine Palu's credibility and raise doubts about his claim that the agreement reverted to a rental agreement after 2011. The record supports the district court's determination that Palu waived his right to enforce the balloon payment in September 2011.

However, Palu further contends that even if there was a waiver, the district court nevertheless erred in finding that the statute of frauds was inapplicable. He argues that the part performance exception to the statute of frauds does not apply. The court found that the "waiver of the balloon payment did not interrupt the land contract as a result and the terms of $550.00 per month at 4.75% interest were still in effect. As such, the Statute of Frauds . . . does not apply to this matter." We agree.

Pursuant to Neb. Rev. Stat. § 36-105 (Reissue 2016), "Every contract for the leasing for a longer period than one year, or for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party by whom the lease or sale is to be made." Here, the parties complied with the statute of frauds by entering into a written contract for the sale of land in 2006. The written agreement was composed of several documents: an "Offer to Purchase" signed by Kumke, an "Acceptance of Offer" signed by Palu, and a deed of trust and installment promissory note signed by both parties. Contrary to Palu's assertion and as discussed above, the 2006 contract was not terminated.

Because we conclude that the statute of frauds does not apply, we need not address the applicability of the part performance exception.

DAMAGES

Palu contends that the district court should have "include[d] all damages resulting from [the] contract" in its order. Brief for appellant at 16. He argues that the court's judgment was based only on the "amortized amount allegedly owed," and failed to include other damages such as Kumke's failure to pay real estate taxes or insurance on the property or "rent or installment payments in more than three years." Brief for appellant at 15-16. Palu does not dispute the $81,958.20 judgment set forth in the December 13, 2023, amended order. But he asserts that the "proper equitable damage calculation" should also include "[u]npaid interest" from December 2020 to December 2023 ($9,729.79), "[d]amages for breach of contract by Kumke" ($84,500), and "[i]nterest on damages for breach of contract" ($35,456.61). *Id*. at 16. He claims he should have been awarded a total of $211,644.60 in damages. Without directing us to any supporting evidence in the record, Palu claims he is entitled to "$84,500 in damages from September 2006 through October 2020, due to Kumke's failure to abide by the terms of the contract, as well as $35,456.61 in interest on those payments at the contractual rate of 4.75% per annum," plus interest of $9,729.79. *Id*.

A quiet title action sounds in equity. *Adair Holdings v. Johnson*, 304 Neb. 720, 936 N.W.2d 517 (2020). The relief ordinarily granted in equity is such as the nature of the case, the law, and the facts demand. *Id.*

Palu fails to direct us to, nor can we find, any specific evidence in the record to support his claim for the above-noted damages. While there may be merit to his claim that Kumke failed to

pay real estate taxes and pay for insurance on the property, there is no evidence as to what amounts were owed. As pointed out by Kumke, "Palu's trial strategy focused on maintaining the falsity that he had never sold the house in the first place"; he chose not to present evidence of "what he believed the correct amount of damages should be if Kumke were to prevail at trial" instead. Brief for appellee at 22. We agree that Palu's request for additional damages cannot be supported on the present record.

CONCLUSION

For the foregoing reasons, we affirm the district court's November 7, 2023, order, and its December 13 order amending the judgment.

AFFIRMED.